#29753-a-SRJ
**2022 S.D. 40**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

WILLIAM BAKER,                                     Plaintiff and Appellant,

    v.

RAPID CITY REGIONAL HOSPITAL
and HARTFORD INSURANCE,                    Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CHRISTINA L. KLINGER
Judge

\* \* \* \*

MICHAEL J. SIMPSON of
Julius & Simpson, LLP
Rapid City, South Dakota                          Attorneys for plaintiff
                                                                    and appellant.


JENNIFER L. WOSJE of
Woods, Fuller, Shultz
  & Smith, P.C.
Sioux Falls, South Dakota                         Attorneys for defendants
                                                                    and appellees.

\* \* \* \*

ARGUED
APRIL 26, 2022
OPINION FILED **07/20/22**

JENSEN, Chief Justice

[¶1.]      During his employment at Rapid City Regional Hospital (RCRH), William Baker sustained two work-related head injuries that he claimed caused him ongoing mental impairments. Baker filed a petition with the Department of Labor and Regulation (Department) seeking workers' compensation benefits from RCRH and its insurer, Hartford Insurance (Insurer), including a determination that he was permanently totally disabled. The Department denied the claim finding that Baker failed to prove that his work injuries were a major contributing cause of his mental impairments and that he failed to establish he was permanently totally disabled. Baker appealed the Department's decision to the circuit court, which reversed and remanded the Department's decision on causation but affirmed the Department's determination that Baker was not permanently totally disabled. Baker appeals, arguing that the Department and circuit court erred in determining he was not permanently totally disabled. We affirm.

## Background

[¶2.]      Baker was born on June 3, 1962. While he attended post-secondary school in the 1980s, he did not earn a degree. From 1981 to 2015, Baker was employed by RCRH in various capacities, including as a custodian, psychiatric aide, life coach, and psychiatric technician. On November 7, 2013, while working as a psychiatric technician, Baker was attacked by a patient and struck across the head. Baker neither lost consciousness nor had any visible injuries, but he later sought treatment at RCRH's emergency room (ER) complaining of a headache. Baker's head CAT (CT) scan and Glasgow Coma Scale test (an exam that tests a patient's

eye movement, speech/verbal skills, and motor skills) were both normal. Baker was prescribed Naprosyn—an anti-inflammatory medication. He returned to the ER a few days later claiming that he lost his prescription. The corresponding medical record from the visit noted a head contusion and included a clinical impression that Baker sustained a closed head injury. Baker did not seek additional treatment regarding this incident and returned to work.

[¶3.] On December 11, 2014, Baker was again attacked and hit on the head by a patient while working at RCRH. Baker did not lose consciousness, but he visited the ER the following day complaining of a headache, nausea, and dizziness. Baker's CT scan and Glasgow Coma Scale test were both normal, and he returned to work a few days later. On December 23, 2014, Baker visited Dr. Carson Phillips, a family medicine physician, complaining of mental fogginess and dizziness. During the examination, Baker failed an Ocular Convergence Test, a test used to measure the distance at which your eyes focus on an object without double vision. Dr. Phillips diagnosed Baker with Post-Concussive Syndrome (PCS) and referred Baker to Dr. Theresa Hastings, a psychologist, for a neuropsychological evaluation.

[¶4.] Baker underwent the neuropsychological evaluation on December 26, 2014. Dr. Hastings noted Baker complained of fogginess, dizziness, and fatigue, among other symptoms. Dr. Hastings opined that Baker suffered from PCS and that he had deficits in short term memory, anxiety, and processing speed. Dr. Hastings ordered Baker off work until cleared by his physician, noting that Baker would be at risk of permanent brain damage or death if he returned to work. On February 3, 2015, Baker saw Dr. Daniel Berens, a doctor of osteopathic medicine,

who noted that Baker's symptoms were slowly improving and that Baker wished to get back to work at RCRH. Dr. Berens directed Baker to resume work for four hours at a time and to slowly progress to working eight hours by the end of February.

[¶5.]        On February 20, 2015, Baker saw Dr. Steven Hata, a neurologist. Dr. Hata diagnosed Baker with PCS, vertigo, mild cognitive disorder, and hypersomnia with sleep apnea. Dr. Hata noted that "patients [who] develop post-traumatic syndrome after a concussion actually have a higher risk of having these symptoms if the concussion was mild rather than severe." However, Dr. Hata also noted that Baker believed his cognitive deficits had improved by 75%. In March 2015, Baker returned to RCRH seeking medical care. He complained of light-headedness and vertigo; he asserted that the variability of the symptoms depended on the stress levels at work. Dr. Patrick Blair, a doctor of osteopathic medicine, recommended Baker take a couple weeks off of work "to focus on himself, cognitive rest, and work[ ] on his sleep[.]" Approximately one month later, in April 2015, Baker again met with Dr. Blair and indicated anxiety, irritability, and fear. Dr. Blair noted that "all of these symptoms are related to [Baker's] work . . . and [ ] seem to have more of a psychological component than [a] physical one." He further opined that Baker's symptoms, in large part, aligned with Post-Traumatic Stress Disorder (PTSD).

[¶6.]        Dr. Hastings completed another neuropsychological evaluation on April 14, 2015, which produced similar results to Baker's prior evaluation. Baker scored in the borderline range in psychomotor processing speed, auditory working memory, and mental control; he was below average in verbal learning and visual

attention. Further, Baker's oral processing speed was in the severe range. Meanwhile, Baker's "[m]ultitasking, mental flexibility, proceeding of semantic memory, and verbal fluency were in the average range." Dr. Hastings diagnosed Baker with Anxiety Disorder and Adjustment Disorder with Mixed Anxiety and Depression, both of which were due to PCS. Dr. Hastings also noted that Baker suffered from "some traumatic stress related anxiety" and that "[h]e easily flinches if someone makes a quick movement near him[.]"

[¶7.]    Baker visited Dr. Hata on April 23, 2015, reporting increased anxiety, dizziness, vertigo, and cognitive deficits. Dr. Hata noted that Baker was oriented, had a normal attention span, and that he had an appropriate mood and affect. Dr. Hata also noted that Baker's remote memory was intact but that his recent memory was impaired. Dr. Hata believed Baker's PCS remained and concluded that Baker's anxiety disorder had developed into PTSD. Dr. Hata recommended the following: (1) psychiatric referral to Dr. Hamlyn; (2) psychotherapy with Dr. Hastings; (3) Baker be removed from direct patient care;[1] (4) follow-up appointment in three months; and (5) neuropsychological testing in no less than six months. Baker met with Dr. Hata again in July 2015 and reported agoraphobia—the fear of crowded places. Baker also complained of loud noises and that he wanted to withdraw from social interactions due to his anxiety. Dr. Hata again concluded that Baker was suffering from PTSD and other symptoms. Baker refused Dr. Hata's

---

1.    Dr. Hata's letter to RCRH, as it pertains to Baker's ability to work, states that "[i]t is my recommendation that this patient not work on the psychiatric locked ward because of anxiety and posttraumatic stress disorder . . . . If this patient can do a job that does not involve direct patient care until he recovers further from this traumatic brain injury, this would be preferable."

recommendation to see Dr. Scott Cherry, a neuropsychologist, stating he did "not like Dr. Cherry."

[¶8.]    RCRH and its Insurer hired Dr. Thomas Gratzer, a psychiatrist, to conduct an Independent Medical Examination (IME) of Baker on June 27, 2015. Dr. Gratzer met with Baker and reviewed his medical records. Dr. Gratzer concluded that Baker's PTSD was in remission as he "did not demonstrate objective manifestations of PTSD[.]" Dr. Gratzer acknowledged Baker's reported symptoms of anxiety and depression, however, he noted these symptoms were improving with medication. The IME report contains various observations by Dr. Gratzer, namely Baker's anger and irritability surrounding the evaluation and his reluctance to answer questions. Dr. Gratzer concluded that Baker did "not have a psychiatric condition at the present time" and that Baker was "not disabled from working as the result of any psychiatric condition[.]" Dr. Gratzer further noted "to the extent that [ ] Baker has realistic worries about being reinjured at work due to the nature of his employment, this is separate from a psychiatric condition, impairment, limitation, or restriction." Dr. Gratzer recommended Baker receive ongoing psycho-pharmacological treatment.

[¶9.]    On June 27, 2015, following a referral from Dr. Gratzer, Dr. Marvin Logel, a psychologist, examined Baker using a Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF).[2] However, Dr. Logel invalidated the

---

2.    Dr. Logel stated that "[t]he MMPI-2-RF is a 338-item version of the MMPI-2(2). The MMPI-2 is an objective psychological test designed to assess personality and psychopathology."

test results due to his conclusion that Baker demonstrated elevated infrequent responses.[3] Baker later participated in a second MMPI-2-RF conducted by Dr. Dewy Ertz, a psychologist, at the request of Dr. Stephen Manlove, a psychiatrist hired by Baker to provide expert opinions in the case. The second test was also invalidated for similar reasons.

[¶10.]      In August 2015, Dr. Hata met with Baker and labeled Baker's PTSD as severe. He disagreed with Dr. Gratzer's IME report, which indicated Baker's PTSD had resolved. Dr. Hata discussed additional medication with Baker but deferred to Dr. Hamlyn and Dr. Hastings. In July 2016, Dr. Hata recounted Baker's history and noted that Baker continued to suffer from many of the same symptoms he complained of earlier. Dr. Hata also noted Baker's symptoms are triggered by stress and that Baker's workers' compensation litigation is stressful. Finally, Dr. Hata concluded Baker's symptoms have circular causality as his "cognitive problems make him depressed and anxious and depression and anxiety make his cognitive symptoms worse."

[¶11.]      Baker began treatment with Dr. Hamlyn in May 2015. Dr. Hamlyn noted Baker's PCS and PTSD diagnoses, stating that "it certainly does sound as though [Baker] suffers from posttraumatic stress disorder[ ] and depression unspecified plus he has the [PCS] which is contributing to his dizziness and his anxiety symptoms." Dr. Hamlyn provided medication management for Baker's

---

3.    The Infrequently-Psychopathological Scale is a validity measure using 27 questions on the MMPI-2 which are infrequently endorsed by respondents with some type of psychopathology or respondents from the normative sample group. An elevated score on this scale can suggest exaggeration of symptoms.

PTSD, depression, and anxiety diagnoses, and referred Baker to Dr. Hastings to address the PTSD symptoms. In July 2015, Dr. Hamlyn ordered Baker off work for six months. Three months later, in a letter dated October 22, 2015, Dr. Hamlyn removed Baker's work restrictions and recommended that Baker not work in the healthcare field or hospital, stating that he felt "it would be beneficial for [Baker] to try to get involved with a different type of work." One month later, Dr. Hamlyn determined Baker was incapable of working any type of job and took Baker off work until he could reassess Baker in a few months. The letter did not include any reason for the change in recommendation.

[¶12.]     At Baker's January 2016 appointment, Dr. Hamlyn noted that Baker complained of depression, anxiety, and irritability. Dr. Hamlyn also noted Baker was angry that his workers' compensation case manager attended the appointment with him and that Baker refused to allow the case manager into the examination room. Dr. Hamlyn concluded Baker was unable to work any kind of job and requested that Baker's medication be reviewed. At a July 2016 appointment, Dr. Hamlyn noted Baker's continuing symptoms of anxiety, depression, and irritability. Dr. Hamlyn believed these symptoms interfered with Baker's ability to work, and Baker was taken off work for an additional six months. Dr. Hamlyn also noted Baker's frustration with workers' compensation issues, highlighting that Baker's anxiety worsens when he does anything related to workers' compensation.

[¶13.]     In September 2015, Dr. Hastings opined that Baker's symptoms prevented him from carrying out "normal desk-job tasks at this time." Dr. Hastings also disagreed with Dr. Gratzer's IME assessment which indicated Baker's mental

health impairments were resolved. However, Dr. Hastings stated that she could not determine the extent of any permanent disability for Baker because the last neuropsychological evaluation, which was conducted in April 2015, was outdated. Baker did not have an updated neuropsychological evaluation prior to the hearing before the Department. In August 2016, Dr. Hastings wrote a letter to Baker's attorney updating Baker's status. The letter referenced Baker's ongoing symptoms and opined that Baker was permanently partially disabled due to his PTSD and PCS. Dr. Hastings also noted Baker's agitation and paranoia, stating it was "due to anxiety over treatment by RCRH and the ongoing litigation."

[¶14.] Following his initial IME report, Dr. Gratzer submitted supplemental reports based on a review of Baker's medical records, vocational reports, and various writings drafted by Baker.[4] Dr. Gratzer reiterated his opinion that Baker did not have any psychiatric restrictions. Dr. Gratzer noted Baker's recent activities such as entering a new relationship and driving himself round trip from South Dakota to Oregon during a fifteen-day period and concluded that Baker did not suffer from any memory loss or the inability to concentrate. Dr. Gratzer also noted Dr. Hasting's observations regarding Baker, notably that Baker's mood,

---

4.    Starting in June 2015, Baker filed numerous complaints with South Dakota agencies, including the South Dakota Attorney General's Office, the South Dakota Board of Nursing, and the South Dakota Department of Health. Baker also filed complaints with Occupational Safety and Health Administration and the Joint Commission on Health Care Accreditation. His complaints related to RCRH and the treatment he allegedly received from the company's employees as well as Appellees' counsel. Further, Baker filed small claims and federal civil actions against various people as well as a protection order against RCRH's and Insurer's attorney. Baker's rambling filings and writings are voluminous in number and length—some reaching forty pages.

attention, and demeanor were intact. He indicated Baker's activities supported "intact functioning" and that in his opinion, "there is evidence of secondary gain affecting [ ] Baker's presentation including preoccupation with medicolegal issues."

[¶15.] From 2015 to 2017, RCRH and Insurer's vocational expert, Jerry Gravatt, worked with Dr. Hamlyn and Baker to find suitable, alternative employment for Baker after it was recommended he no longer work in direct patient care or in a health-related field. Gravatt provided Dr. Hamlyn with available jobs that met Baker's employment restrictions, including a position as a central sterilization technician, assembly operator, dental lab/dental tech, factory worker, and jewelry polisher. In December 2015, Gravatt sent RCRH's attorney an additional list of eleven available, part-time to full-time jobs with limited public and co-worker interaction. The list included job descriptions and salaries when available.[5] In June 2017, Gravatt updated the list with thirteen different, available jobs.[6]

[¶16.] Meanwhile, Baker's vocational expert, James Carroll, concluded Baker was "unemployable and that a job search would be futile." Carroll reviewed Baker's

---

5.  The following job titles were included in Gravatt's list: (1) inventory merchandising outfitter; (2) inventory specialist at Best Buy; (3) inventory specialist at RGIS; (4) shelf integrity associate; (5) janitor; (6) assembly operator; (7) backroom associate; (8) delivery driver at Western Stationers; (9) delivery driver at Jimmy John's; (10) Deadwood Biofuels (no job title listed); and (11) laundry worker.

6.  The June 2017 letter included the following jobs: (1) production assembler; (2) press operator; (3) CNC machine operator; (4) scanning clerk; (5) inventory specialist; (6) call taker/dispatch operator at humane society; (7) mailroom clerk; (8) inventory associate; (9) warehouse associate/inventory control; (10) dispatcher at Auto Glass; (11) product support specialist; (12) dialer collector/front end collections; and (13) client services representative.

medical records, legal pleadings, and other writings, and met with Baker for an in-person interview. Carroll noted that "[a]ll of [Baker's] treating medical/psychological practitioners including Dr. Hata, Dr. Hastings, Dr. Hamlyn and Dr. Manlove have rendered the opinion that [he] is in need of intensive psychiatric treatment and . . . [in]capable of employment of any kind." He also noted Dr. Gratzer's opinion, as it pertained to Baker's PTSD being in remission, had been rejected by Baker's treating medical providers. Carroll did not, however, note his own impressions or observations of Baker.

[¶17.] Upon Baker's request, Dr. Manlove conducted an in-person independent psychiatric evaluation. Unlike Dr. Gratzer, Dr. Manlove concluded that Baker suffered from PTSD with delayed expression. Dr. Manlove further determined Baker's psychological problems had worsened since the assaults as evidenced by his extensive medical records and personal writings. He also stated he believed Baker was not "malingering mental illness" because Baker's "hypervigilance and paranoia go far beyond his workers' compensation claim."

[¶18.] Dr. Manlove emphasized Baker's various lawsuits, incoherent writings, and examinations.[7] Specifically, Dr. Manlove noted Baker's invalid MMPI-2-RF examination and opined that the invalid result did not suggest malingering but rather PTSD. Using the Psychiatric Impairment Rating Scale (PIRS), Dr. Manlove concluded Baker had a 22% permanent partial impairment rating. He determined

---

7.    Dr. Manlove noted that in Baker's writings, "[Baker] over-interprets a host of issues, not just related to his workers' compensation claim, in paranoid ways. [Baker] discussed issues such as being stalked, being harassed, and being subjected to prejudice."

Baker had mild impairment in the self-care and personal hygiene category, no impairment in the travel category, moderate impartment in both the social functioning and concentration/persistence/pace categories, and total impairment in the adaptation category. Dr. Manlove noted that while Baker's PCS improved, Baker's PTSD symptoms worsened and that "[h]e is [ ] unable to maintain employment at this time[.]" Further, Dr. Manlove noted that while he hoped Baker would improve with therapy, such improvement had not yet occurred and that "it seems likely [ ] his disability will be permanent."

[¶19.] Dr. Gratzer disagreed with Dr. Manlove's conclusion that Baker's PTSD was worsening and instead reaffirmed his earlier conclusion that Baker was not permanently totally disabled. Dr. Gratzer also discussed Gravatt's list of currently available jobs, concluding that the listed jobs would meet Baker's skill base and need for limited social interaction.

[¶20.] RCRH terminated Baker's employment via letter on November 7, 2016. The letter noted that Baker had not worked at RCRH since June 2015 and that he had exhausted all types of leave available to him, including leave under the Family Medical Leave Act (FMLA) and the Americans With Disabilities Act (ADA).

[¶21.] In December 2016, Dr. Hata met with Baker and reviewed his medical records and affiliated expert reports. Dr. Hata noted Baker's symptoms, which mirrored those described earlier by Baker. Baker told Dr. Hata that he had a permit for a concealed weapon and that he bought a gun after someone broke into the home he was living in. Further, Dr. Hata noted Baker's paranoia and obsession surrounding his litigation with RCRH. Dr. Hata listed various conclusions: (1)

Baker reached maximum medical improvement (MMI) regarding his headaches and dizziness; (2) Baker had not reached MMI from a neuropsychological or cognitive standpoint; (3) Baker's symptoms were psychiatric; and (4) Baker's "obsession with his overt hostility toward [RCRH] right now overshadows much of what can be assessed objectively in terms of his neuropsychological status." Dr. Hata addressed Dr. Gratzer's IME findings, noting that he did "not agree 100% with [the] exam" and that he believed Baker's "degree of paranoia and obsession that he display[ed] today [was] definitely worse than . . . ever seen before." Dr. Hata again recommended Baker obtain an independent neuropsychological evaluation from Dr. Cherry but noted Baker refused because "he knows Dr. Cherry and dislikes him[.]"

[¶22.]      In July 2017, Dr. Manlove submitted a report detailing Baker's psychiatric status. In preparing the report, Dr. Manlove reviewed all of Baker's updated medical records, various writings authored by Baker, and Dr. Gratzer's supplemental reports. In his report, Dr. Manlove noted Baker was "clean, acutely unkempt" and that "[h]e was neither distractible nor physically impulsive." Dr. Manlove also noted Baker was anxious and had traumatic dreams about RCRH setting him up to imprison him. Dr. Manlove stated that "[Baker's] hypervigilance about his safety has evolved in paranoia about various health care related systems" and that Baker "was concerned about developing suicidal thoughts due to the pressure of his current legal matter." The report appears to transcribe Dr. Manlove's interaction with Baker, noting Baker stated "[i]f this doesn't turn out so that justice is served[,] I might have suicidal thoughts." The transcription also includes various conspiratorial statements from Baker that RCRH is out to get him.

[¶23.]     Dr. Manlove concluded Baker's mental health dramatically deteriorated since the time of injury and that Baker's paranoia and anxiety resulted in a thought disorder (looseness of associations), which made "it hard for [ ] Baker to problem solve in a rational manner." Based on Baker's symptoms and medical records, Dr. Manlove determined that "Baker is not employable at this time."

[¶24.]     Baker submitted a petition for hearing to the Department, arguing that the 2013 and 2014 injuries remained a contributing cause of his mental impairments and that he was entitled to permanent total disability benefits. The Department held a hearing on October 2, 2017. Baker was the only in-person witness. On May 2, 2018, the Department issued a written decision, determining that Baker did not prove by clear and convincing evidence that the 2013 and 2014 injuries remained a major contributing cause of his mental impairments and that Baker was not entitled to permanent total disability benefits.

[¶25.]     In denying the claim for permanent total disability, the Department noted Baker's age, his employment and education history, and that he did not attempt to find work with alternative employers. The Department observed that Baker's claim for obvious unemployability was premised on Carroll's opinion that Baker was "unemployable and incapable of being retrained." The Department also noted Dr. Hamlyn's and Dr. Manlove's opinions that Baker was unable to work at the time of their examinations. In finding this evidence did not support Baker's claim for obvious unemployability, the Department reasoned that Dr. Hata, "who saw [Baker] the longest[,]" and Dr. Gratzer both believed Baker could work. Additionally, the Department rejected Carroll's opinion because it "depended in

large part on the assumptions that [Baker's] PTSD was work-related and a major contributing cause for his permanent disability[.]" The Department also found that Baker suffered from mental impairments but that it was "not clear [the impairments were] truly disabling, and even if it is assumed they were, the greatest causes for his impairment and/or disability – his explosive anger, his paranoia, and his obsession with vengeance – were not caused by the physical trauma of 2013 and 2014."

[¶26.] Baker timely appealed the Department's decision to the circuit court, which affirmed in part and reversed in part. As to the question of compensability, the court disagreed with the Department's decision that Baker's work injuries were not the cause of his mental impairments and remanded the case to determine whether additional medical expenses or other benefits may be due.

[¶27.] However, the circuit court agreed with the Department's conclusion that Baker was not permanently totally disabled. The court determined that "[Baker] failed to make a prima facie showing through either his own testimony or through medical evidence, that any of the physical manifestations of his current mental condition, along with his age, training and experience, and work available in his community, renders him obviously unemployable." The circuit court also determined Baker failed to meet his burden to show that a good faith work search would be futile, noting Baker's ability to spend "long hours researching, writing, and traveling independently" as well as his ability to "communicate and interact appropriately with other individuals when he so chooses, so long as they are not associated with [RCRH] or these workers' compensation proceedings."

[¶28.] On remand, the Department determined that Baker was entitled to additional medical expenses and benefits based on the circuit court's finding of causation. Following the Department's decision on remand, the circuit court entered a final order after remand on August 20, 2021. Baker timely appealed the decision, raising the following issue on appeal: Whether the Department and circuit court erred in determining that Baker was not permanently totally disabled.[8]

## Standard of Review

[¶29.] This Court's standard of review in agency proceedings is governed by SDCL 1-26-37, which provides that "[t]he Supreme Court shall give the same deference to the findings of fact, conclusions of law, and final judgment of the circuit court as it does to other appeals from the circuit court." When reviewing an agency's findings, the circuit court and this Court "shall give great weight to the findings made and inferences drawn . . . on questions of fact." SDCL 1-26-36. Thus, "[t]he Department's factual findings and credibility determinations are reviewed under the clearly erroneous standard." *Wise v. Brooks Constr. Servs.*, 2006 S.D. 80, ¶ 16, 721 N.W.2d 461, 466 (citations omitted). A finding is clearly erroneous when "we are definitely and firmly convinced a mistake has been made." *Billman v. Clarke Mach., Inc.*, 2021 S.D. 18, ¶ 22, 956 N.W.2d 812, 819 (citation and internal quotation marks omitted). "Whether a claimant makes a prima facie case to establish odd-lot total disability inclusion is a question of fact." *Vollmer v. Wal-Mart Store, Inc.*, 2007 S.D. 25, ¶ 12, 729 N.W.2d 377, 382. However, de novo review

___

8. RCRH and Insurer have not appealed the circuit court's finding of causation nor the Department's decision awarding additional benefits.

is used "when 'an agency makes factual determinations on the basis of documentary evidence, such as depositions' or medical records." *Darling v. W. River Masonry, Inc.*, 2010 S.D. 4, ¶ 10, 777 N.W.2d 363, 366 (citations omitted).

## Analysis

[¶30.] SDCL 62-4-53 sets forth the criteria for obtaining permanent total disability benefits. The statute provides, in relevant part:

> An employee is permanently totally disabled if the employee's physical condition, in combination with the employee's age, training, and experience and the type of work available in the employee's community, cause the employee to be unable to secure anything more than sporadic employment resulting in an insubstantial income. An employee has the burden of proof to make a prima facie showing of permanent total disability. The burden then shifts to the employer to show that some form of suitable work is regularly and continuously available to the employee in the community. The employer may meet this burden by showing that a position is available which is not sporadic employment resulting in an insubstantial income as defined in subdivision 62-4-52(2). An employee shall introduce evidence of a reasonable, good faith work search effort unless the medical or vocational findings show such efforts would be futile. The effort to seek employment is not reasonable if the employee places undue limitations on the kind of work the employee will accept or purposefully leaves the labor market. An employee shall introduce expert opinion evidence that the employee is unable to benefit from vocational rehabilitation or that the same is not feasible.

SDCL 62-4-53.

[¶31.] We have held that a claimant presents a prima facie showing of permanent total disability under the statute by presenting evidence: "(1) claimant is obviously unemployable due to his or her physical condition, coupled with his or her age, training and experience,[ ] or (2) [of the] unavailability of suitable employment

by showing that he or she has made reasonable efforts to find work and was unsuccessful."[9]  *Billman*, 2021 S.D. 18, ¶ 25, 956 N.W.2d at 820.

[¶32.]     If a claimant makes a prima facie showing of obvious unemployability, "then the burden of production shifts to the employer to show that some suitable employment within claimant's limitations is actually available in the community." *Eite v. Rapid City Area Sch. Dist. 51-4*, 2007 S.D. 95, ¶ 21, 739 N.W.2d 264, 270 (citations omitted).  Alternatively, if a claimant is unable to show obvious unemployability, the claimant must present evidence of "the unavailability of suitable employment by showing that he has made reasonable efforts to find work and was unsuccessful."  *Id.* ¶ 21, 739 N.W.2d at 271 (citations omitted).  "The burden will only shift to the employer in this second alternative when the claimant produces substantial evidence that he is not employable in the competitive market." *Spitzack v. Berg Corp.*, 532 N.W.2d 72, 75 (S.D. 1995).  Then "the burden shifts to the employer to show that some form of suitable work is regularly and continuously available to the claimant."  *Eite*, 2007 S.D. 95, ¶ 21, 739 N.W.2d at 271 (citations omitted); *see Sandner v. Minnehaha Cnty.*, 2002 S.D. 123, ¶ 10, 652 N.W.2d 778, 783 (citation omitted).  Although the burden may shift amongst parties, "the ultimate burden of persuasion remains with the claimant."  *Eite*, 2007 S.D. 95, ¶ 21, 739 N.W.2d at 271 (emphasis omitted).

---

9.     As noted in *Billman*, "[u]nder the first avenue, the claimant may also show that he or she is obviously unemployable due to being in 'the kind of continuous severe and debilitating pain which he [or she] claims.'"  2021 S.D. 18, ¶ 25 n.4, 956 N.W.2d at 820 n.4 (citation omitted).  Baker did not seek permanent total disability under this theory.

[¶33.] Baker has not worked since 2015, and he failed to present evidence that he applied for any jobs or made any effort to find employment since then. Based upon the record, the Department stated that if Baker is "to establish permanent total disability, he must therefore prove he is 'obviously unemployable' due to his age, education, training, and any mental conditions for which his 2013 and 2014 physical traumas were a major contributing cause." We agree, and Baker does not argue otherwise.

[¶34.] On appeal, Baker asserts that the Department and the circuit court erred in denying his claim for permanent total disability because, in his view, he made a prima facie showing that he was obviously unemployable, thus shifting the burden of production to RCRH and Insurer to show suitable employment is regularly and continuously available for Baker.[10] Baker claims that RCRH and Insurer failed to meet this burden. In particular, he argues RCRH and Insurer's vocational expert failed to "inform potential employees of all of Baker's limitations, such as his total inability to adapt himself due to worsening PTSD, as described by Dr. Manlove." Baker cites several of our prior decisions, arguing that these cases require an employer/insurer to "'inform potential employers' of *all* of the [his]

---

10. The circuit court did, in fact, conclude that Baker presented a prima facie case that no suitable employment was available to him, stating that Baker "offered medical and vocational evidence from Dr. Manlove and James Carroll, which *if unanswered*, constituted a sufficient *prima facie* showing that a work search would be futile due to [Baker's] compensable mental conditions." However, the circuit court determined RCRH provided proof of suitable employment, regularly and continuously available to Baker, and that Baker had failed to carry his ultimate burden of persuasion in establishing a permanent total disability.

limitations" in order to meet their burden of showing available, suitable employment. (Emphasis added.)

[¶35.] RCRH and Insurer respond that Baker failed to make a prima facie showing of obvious unemployability. RCRH and Insurer assert that the burden therefore never shifted to them. Further, RCRH and Insurer argue, even if Baker presented a prima facie case of obvious unemployability, there was proof of available, suitable work that Baker could perform, and that "[i]t is undisputed that [Baker] made no efforts whatsoever to find work."

[¶36.] This Court has examined numerous times whether a claimant is entitled to odd-lot disability for physical conditions under SDCL 62-4-53. *See Billman*, 2021 S.D. 18, 956 N.W.2d 812; *Shepherd v. Moorman Mfg.*, 467 N.W.2d 916 (S.D. 1991); *Sandner*, 2002 S.D. 123, 652 N.W.2d 778. However, this Court has yet to determine whether a claimant is entitled to odd-lot disability under SDCL 62-4-53 based upon a mental condition. The language of the statute providing for odd-lot disability states "if the employee's *physical condition*, in combination with the employee's age, training, and experience and the type of work available in the employee's community, cause the employee to be unable to secure anything more than sporadic employment resulting in insubstantial income[,]" then the burden shifts to the employer to prove suitable, alternative employment.[11] SDCL 62-4-53

---

11. The definition of an "injury" in SDCL 62-1-1(7), for purposes of the workers' compensation statutes, was amended by the Legislature in 1999 to provide compensability for some mental injuries. *See* SDCL 62-1-1(7) (stating that "[a] mental injury is compensable only if a compensable physical injury is and remains a major contributing cause of the mental injury, as shown by clear and convincing evidence"). However, the question here is not one of

(continued . . .)

(emphasis added). The circuit court concluded that the language of the statute does not permit a claimant to prove obvious unemployability based upon a mental condition that does not have an underlying physical condition, but neither party has briefed or argued this issue on appeal.[12]

[¶37.]     Therefore, assuming, without deciding that odd-lot disability under SDCL 62-4-53 applies to mental conditions, we first consider whether Baker presented prima facie evidence of obvious unemployability. Baker presented evidence from various treating medical providers that he continued to suffer from ongoing mental impairments. Prior to the Department hearing, Dr. Manlove rated Baker with a 22% permanent partial impairment and concluded "[h]e is unable to maintain employment at this time[.]" Baker's vocational rehabilitation expert, Carroll, also opined Baker is unable to work and a job search would be futile. Baker also presented evidence that he was determined disabled for social security purposes. While Social Security determinations are persuasive on the question of disability, the decisions are not controlling. *See Vilhauer v. Dixie Bake Shop*, 453 N.W.2d 842, 846 (S.D. 1990).

[¶38.]     A prima facie showing of obvious unemployability necessary to shift the burden to the employer requires the claimant to present "evidence *which if*

---

(. . . continued)
    compensability. The circuit court concluded that Baker's injury was compensable, and that decision is not challenged on appeal. Rather the question presented in this appeal relates only to a type of workers compensation benefit—permanent total disability benefits.

12.    Given the absence of briefing on the issue and our ultimate resolution of this case, it is unnecessary to determine whether the Legislature intended to apply odd-lot disability under SDCL 62-4-53 to a mental condition.

*unanswered* would justify persons of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain." *Sandner*, 2002 S.D. 123, ¶ 13, 652 N.W.2d at 783 (emphasis added) (internal quotation marks omitted). We conclude this evidence was sufficient to establish a prima facie case of obvious unemployability.

[¶39.] The burden then shifted to RCRH and Insurer to establish suitable employment within Baker's community existed "by showing that a position is available which is not sporadic employment resulting in an insubstantial income . . . ." SDCL 62-4-53. Baker does not claim that the positions presented by Gravatt were sporadic or outside his community. Rather, Baker disputes the suitability of these positions, arguing that Gravatt needed to speak to each employer and inform them of his limitations before suggesting these positions were suitable for him. Baker cites several cases to support his claim. *See Shepherd*, 467 N.W.2d 916; *Eite*, 2007 S.D. 95, 739 N.W.2d 264; *Kurtz v. SCI*, 1998 S.D. 37, 576 N.W.2d 878; *Enger v. FMC*, 1997 S.D. 70, 565 N.W.2d 79; *Billman*, 2021 S.D. 18, 956 N.W.2d 812. However, none of these cases stand for the proposition asserted by Baker. Our cases only require an employer "show more than a general availability of jobs to persons with some of claimant's disabilities." *Shepherd*, 467 N.W.2d at 920 (noting an "[e]mployer must [ ] demonstrate[ ] the existence of 'specific' positions 'regularly and continuously available' and 'actually open' in 'the community where the claimant is already residing' for persons with *all* of claimant's limitations" (citation omitted)). While an employer must consider all of a claimant's limitations in relationship to the requirements of the position when providing suitable

employment options, we have not imposed the exacting requirement suggested by Baker that the employer must speak with each prospective employer and inform them of claimant's limitations. *See Cap. Motors, LLC v. Schied*, 2003 S.D. 33, ¶ 12, 660 N.W.2d 242, 247 (noting "the law does not require an employer to actually place a claimant in an open job, [but] an employer must show more than mere possibility of employment").

[¶40.] In *Enger*, we determined that although actual job placement is not required, the included positions must provide the claimant "with the opportunity for employment within [his] job restrictions." 1997 S.D. 70, ¶ 25, 565 N.W.2d at 86 (citation and internal quotation marks omitted). For instance, in *Enger* the claimant needed "special accommodations by equipment [ ] or personnel in order to hire [claimant]," and the vocational expert's failure to confirm that the potential employers could attain said accommodations was insufficient to establish that suitable employment existed. *Id.* Further, we have also concluded that a vocational expert's testimony can be discounted when "significant pieces of information regarding claimant's abilities" are left out by the expert when inquiring about available jobs. *Rank v. Lindblom*, 459 N.W.2d 247, 250 n.1 (S.D. 1990); *see Eite*, 2007 S.D. 95, ¶ 28, 739 N.W.2d at 273 (noting that "[a]n expert's listing of jobs that focuses on a claimant's capabilities to the exclusion of his limitations is insufficient as a matter of law"). Here, Baker's limitations did not require potential employers to make special accommodations like those in *Enger*.

[¶41.] The jobs presented by Gravatt reflected Baker's limitations described by Baker's medical providers. Gravatt listed roughly 30 jobs that were available in

the community for Baker, only one of which involved working in healthcare—something Dr. Hata and Dr. Hastings discouraged. Further, the jobs were "unskilled to semi-skilled with limited or no training required to perform the duties of the job." The jobs required "light to medium physical demand" and included descriptions about the type of work required of Baker should he obtain the job. In locating these positions, Gravatt worked within the established limitations of Dr. Hata and Dr. Hastings by including jobs with limited social interaction, simple and repetitive tasks, and light to medium physical demand rather than intellectual. In his 2016 deposition, Dr. Hata, who treated Baker since 2014, testified that Baker was employable and that he would not prohibit Baker from attempting any of the jobs Gravatt recommended. Dr. Hata also testified that he could not see Baker had any physical limitations and that "undemanding, not a lot of people interaction, [ ] physical jobs rather than intellectual jobs, would be appropriate[.]"

[¶42.]     Baker did not challenge his ability to perform any of the specific jobs identified by Gravatt, nor did he present evidence that he had unsuccessfully applied for any of these positions. Instead of addressing the specific positions set forth by Gravatt, Baker merely relied upon Carroll's opinions that Baker was incapable of any employment and that a work search would be futile. Both the Department and the circuit court properly rejected Carroll's opinions because they were premised on a faulty conclusion that all the treating practitioners had concluded Baker was not capable of employment of any kind. Both Dr. Hata and Dr. Gratzer opined that Baker was able to work. Further, the work restrictions provided by Drs. Hastings, Hamlyn, and Manlove were all temporary. None of the

medical providers concluded that Baker was permanently disabled. In fact, Dr. Hastings specifically noted that she was unable to reach a determination of the extent of any permanent disability because Baker's neuropsychological evaluation, an evaluation Baker refused to complete prior to the Department hearing because he was unwilling to see Dr. Cherry, was outdated. Finally, Dr. Gratzer also concluded that Baker was able to work.

[¶43.] Additionally, there is no indication that Carroll considered Baker's mental status exams conducted by the treating health professionals, which were mostly unremarkable during the two years prior to the hearing before the Department. Dr. Gratzer also observed that Carroll's opinion of "futility" failed to consider that Baker successfully completed an extended road trip, engaged in a new personal relationship, and showed both attention and concentration abilities during his sessions with Dr. Hastings.

[¶44.] The record is void of any evidence indicating Baker attempted to find employment. Baker neither applied for jobs offered by Gravatt nor enlisted with job services or educational programs. In his deposition, Baker stated he did not know how he "could possibly work around people" but later acknowledged that some of the jobs presented by Gravatt did not require personal interaction. When asked why he believed he was disabled, Baker stated that "[t]here's lots of reasons," including doctors' reports. We have recognized that "[t]he effort to seek employment is not reasonable if the employee places undue limitations on the kind of work the employee will accept or purposefully leaves the labor market." *Sandner*, 2002 S.D. 123, ¶ 22, 652 N.W.2d at 784 (holding that a claimant's job search was

not reasonable and that he delayed or failed to follow up on a number of job referrals provided by a vocational expert).

[¶45.]     Based upon a de novo review of the medical and vocational testimony, we are not convinced that Baker's impairments, along with his age, training, and experience, would prevent him in obtaining employment with most of the employers included in Gravatt's list.  In reaching this conclusion, we also give appropriate deference to the Department's conclusion, after having the opportunity to assess Baker's testimony and observe him in person, that Baker was not permanently totally disabled.  *Flint v. Flint*, 2022 S.D. 27, ¶ 40, 974 N.W.2d 698, 705; *see Billman*, 2021 S.D. 18, ¶ 28, 956 N.W.2d at 820 ("We do not substitute our judgment for the Department's on the *weight of the evidence* or the credibility of witnesses." (citation omitted)).

[¶46.]     We affirm the Department and circuit court's determination that Baker failed to sustain his claim for permanent total disability.

[¶47.]     SALTER and MYREN, Justices, and VINBERG-WICKRE, Circuit Court Judge, and KONENKAMP, Retired Justice, concur.

[¶48.]     KERN, Justice, deeming herself disqualified, did not participate.

[¶49.]     DEVANEY, Justice, deeming herself disqualified, did not participate.

[¶50.]     KONENKAMP, Retired Justice, sitting for KERN, Justice, disqualified.

[¶51.]     VINBERG-WICKRE, Circuit Court Judge, sitting for DEVANEY, Justice, disqualified.