#29721-a-MES
**2022 S.D. 27**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JEREMY FLINT,                                    Plaintiff and Appellant,

   v.

LYNDSEY FLINT,                                  Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON SOGN
Judge

* * * *

GREGORY T. BREWERS of
Strange, Farrell, Johnson
  & Brewers, P.C.
Sioux Falls, South Dakota                       Attorneys for plaintiff
                                                and appellant.


THOMAS M. KELLER
Thomas M. Keller, Prof. LLC
Sioux Falls, South Dakota                       Attorneys for defendant
                                                and appellee.

* * * *

CONSIDERED ON BRIEFS
APRIL 25, 2022
OPINION FILED **05/11/22**

#29721

SALTER, Justice

[¶1.]    Jeremy and Lyndsey Flint are former spouses and the parents of a six-year-old daughter, V.F.  The parties originally shared physical custody of V.F. under a parenting order entered as part of their 2018 Arizona divorce.  In 2019, Jeremy moved to South Dakota, registered the Arizona divorce and child custody order, and sought primary physical custody of V.F.  Lyndsey, now living in California, opposed Jeremy's request and sought primary physical custody herself.  Following a court trial, the circuit court granted Lyndsey's request, placing V.F. in her primary physical custody.  Jeremy appeals, arguing the court abused its discretion.  We affirm.

## Background

[¶2.]    The parties met in 2010 through a mutual friend and began dating.  Jeremy is originally from Sioux Falls, but at the time, he was serving in the United States Air Force and stationed at Travis Air Force Base near Fairfield, California.  Lyndsey is from the Fairfield area.

[¶3.]    The couple continued their relationship after Jeremy was transferred to Guam in early 2011.  Despite the distance, their relationship flourished, and the parties were married in October 2011 during Jeremy's stateside leave.  He returned to Guam, and Lyndsey remained in California with her young son, A.M., from a previous relationship.

[¶4.]    After completing his tour in Guam, Jeremy took an assignment with the Air Force Thunderbirds demonstration squadron, stationed in Las Vegas,

Nevada. Lyndsey joined him there while A.M. remained in California with his father, which, she asserted, enabled A.M. to remain in his school.

[¶5.] The parties' daughter, V.F., was born in 2016. Lyndsey had previously worked as a realtor, but after V.F.'s birth, she remained at home to care for her. The family moved to Tucson, Arizona, in April 2017, again in connection with orders transferring Jeremy to a new assignment.

[¶6.] The parties separated in October 2017, and an Arizona divorce action followed. Both parties acknowledge stressors leading up to the breakup, including alcohol abuse and isolation within the home. The parties confronted additional difficulties for a period of time after the separation. For example, Lyndsey had not been working outside of the home, and the record contains indications that she initially experienced financial insecurity and changed addresses multiple times.

[¶7.] The parties generally shared custody of V.F. during the pendency of the divorce. However, for some periods, Jeremy exercised more parenting time as Lyndsey sought to establish a law enforcement career, first as a prison guard with the Arizona Department of Corrections.

[¶8.] The parties finalized their divorce in 2018, and in February 2019, Lyndsey began a federal law enforcement career with the Department of Homeland Security as a Customs and Border Protection officer. The job required an extended period of standard law enforcement training and Spanish language instruction at a federal training facility in Georgia, during which time V.F. remained with Jeremy.

[¶9.] Around the same time, Jeremy was preparing to leave the military and relocate to South Dakota. Before Lyndsey left for Georgia, the parties signed what

they have described as an agreement, written as a first-person statement by Lyndsey, in which she "authorize[d] Jeremy Flint to take . . . [V.F.] to South Dakota during his transition out of the military." Regarding a future parenting arrangement, the document stated only, "Once I return from my training in Georgia . . . , we will reassess visitation depending on our respective work schedules."

[¶10.] Jeremy moved back to South Dakota in May 2019 and eventually purchased a home in Brandon. He began working at the Earth Resources Observation and Science (EROS) Center and is a member of the South Dakota Air National Guard. While Lyndsey completed her training, he enrolled V.F. in daycare.

[¶11.] Although Lyndsey's ability to leave her training facility was restricted, she and her parents attempted to have V.F. visit her there, including a proposal under which V.F. would accompany Lyndsey's parents to her graduation ceremony, traveling in their RV camper. Jeremy was not receptive to that idea, and V.F. did not see her mother for several months. The two did, however, maintain contact through telephone or video calls.

[¶12.] Stark differences between the parties' ideas for co-parenting became apparent after Lyndsey completed federal law enforcement training in August 2019. In her view, the agreement the parties signed before she left simply allowed Jeremy to take V.F. with him to South Dakota as he transitioned out of the military—not relocate with V.F. Lyndsey claimed she anticipated returning to Arizona and continuing a co-parenting arrangement with Jeremy there. However, Jeremy's

relocation to South Dakota was permanent, and he intended to become V.F.'s primary custodial parent.

[¶13.] After her graduation, Lyndsey requested and received a transfer from her anticipated duty station in Nogales, Arizona, to the San Francisco airport. Despite a lengthy commute, the transfer allowed her to locate in the Fairfield area where most of her family lives, including her parents.

[¶14.] Efforts to reestablish a co-parenting arrangement proved difficult for the parties, and Lyndsey did not see V.F. for several months after the completion of her training in August 2019. Jeremy had registered the Arizona divorce and parenting order in July 2019, and, in October 2019, he moved to modify the original shared parenting arrangement and also for interim primary physical custody of V.F. Initially appearing pro se, Lyndsey opposed Jeremy's motion and sought primary physical custody of V.F. and the implementation of the South Dakota Parenting Guidelines.

[¶15.] The circuit court conducted a hearing on the request for interim relief in October 2019. Lyndsey was personally present, and both she and Jeremy provided limited testimony which established, among other things, that just days before the hearing, Lyndsey had her first in-person time with V.F. since leaving for training in Georgia in February 2019. Both parties attempted to shift responsibility for the prolonged period to the other, but most of the separation was due to Lyndsey's training, which she described as similar to initial military training.[1]

---

1. Lyndsey engaged counsel after the initial hearing and has been represented since that time.

[¶16.]     During the time after Lyndsey's graduation in August until the October visit, the parties had each been asserting the desire to have primary physical custody of V.F.  Although Jeremy had offered to fund a trip to South Dakota for Lyndsey to see V.F., Lyndsey did not want to be relegated to seeing V.F. in South Dakota and wanted V.F. to be with her in California.

[¶17.]     The circuit court found that both parents loved V.F. and were capable of caring for her.  The court denied Jeremy's request for interim primary physical custody and entered an order that allowed Lyndsey to have V.F. with her in California for two weeks.  After that, V.F. would return to South Dakota, and the parties were ordered to transition into a month-on/month-off shared parenting arrangement.[2]

[¶18.]     Given the expedited nature of the interim custody issue, the court appeared to draw some support from the fact that the current, prevailing Arizona order established shared parenting.  However, the court predicted that continuing the arrangement may not provide a good long-term solution after a more complete development of the record at trial.

[¶19.]     The circuit court conducted a custody trial on January 14–15, 2021. The evidence included the testimony of Erin Nielsen Ogdahl who had completed a custody evaluation.  Nielsen Ogdahl observed V.F. at home with each parent, developed background and collateral information, and reviewed the results of psychological evaluations of both parents.  Though her ultimate recommendation favored Jeremy, Nielsen Ogdahl's report indicated:

---

2.     The interim parenting arrangement developed into an eight-week rotation.

This evaluator does not have any concerns with either party's physical or mental health. The psychological evaluations completed indicate no serious concerns for either party and observations made seem in line with what this evaluator has observed.

\*\*\*\*

Both parties clearly love their child and show her much affection. Those feelings are clearly returned by the child.

\*\*\*\*

This evaluator does not believe either party has deliberately kept the child from the other. Although Jeremy did not accommodate Lyndsey's requests, it is believed he had reasonable concern and the two must work to get on the same page.

\*\*\*\*

[V.F.] seems closely bonded with each parent and has quality relationships with other family members, namely her grandparents.

[¶20.] Also in her report, Nielsen Ogdahl noted "concerns with Lyndsey's long-term plan and stability with work and location." In her testimony, Nielsen Ogdahl referenced Lyndsey's initial training and a seven-week period of additional training in Philadelphia. While there, Lyndsey stayed with her boyfriend who is also a Customs and Border Protection officer. A.M. was with Lyndsey in Philadelphia, and V.F. traveled there to stay with her mother as part of the court's interim shared parenting order. Because Lyndsey's training took place during standard workday hours, the children were enrolled in daycare during the seven-week period. Lyndsey was not satisfied with the initial daycare in Philadelphia and eventually changed providers—a fact Nielsen Ogdahl noted and contrasted with the consistent daycare arrangement Jeremy had established for V.F. in Brandon.

[¶21.] During a brief cross examination, Nielsen Ogdahl agreed with Lyndsey's attorney that the case presented a close call. She acknowledged that the parties were both "good parents" and that other custody evaluators looking at the same information in the case could reach a different conclusion.

[¶22.] For its part, the circuit court did, in fact, reach a different conclusion. In an oral decision issued ten days after the trial, the court granted primary physical custody of V.F. to Lyndsey. However, the court emphasized that "[t]his was a very difficult case for me" and expressed regret that the distance between the parents' homes effectively ruled out a long-term shared parenting plan. The court told the parties, "You're both very good people; very good parents. Either one of you would be an excellent choice for custody of [V.F.]"

[¶23.] The circuit court found the witnesses who had testified, including the parties, to be credible, though the court regarded Jeremy as more credible than Lyndsey because she had been impeached during cross examination.[3] The court indicated its familiarity with the contextual aspects of the parties' marriage, separation and divorce, but it did not "assign[ ] a lot of weight to either party's conduct during the time of the separation up through divorce[,]" noting that "those are some dark times" that both Jeremy and Lyndsey overcame and "are doing better now."

---

3. During direct examination, Lyndsey denied that she had taken $800 from Jeremy's wallet while they still lived together and also testified that Jeremy had not permitted her to have video calls with V.F. However, after successful impeachment, the circuit court concluded that both areas of testimony appeared to be inaccurate.

[¶24.] The circuit court explained the need to make its determination based solely upon V.F.'s best interests, citing our decision in *Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, 591 N.W.2d 798, and the familiar factors for evaluating a child's best interest. *See* 1999 S.D. 35, ¶¶ 24–33, 591 N.W.2d at 808–10. Referencing specific factors, the court found that the parties are both fit parents who are young and in good physical and mental health.[4] Each parent is also able to care for V.F. and provide for her needs. The court determined that Jeremy had been less willing than Lyndsey to provide frequent and meaningful contact with V.F. when she was in his care. The court also found that Jeremy had used his position as V.F.'s de facto custodial parent to frustrate reasonable parenting time for Lyndsey.

[¶25.] Jeremy's principal argument at trial, and again on appeal, is that Lyndsey demonstrated instability through her address and career changes after the parties separated. But the court was unwilling to find either to be signs of persistent instability that impacted V.F.'s best interests. Instead, the court viewed the initial training absence, in particular, as a necessary "short-term absence for a long-term gain" because it would ultimately provide a better future for both Lyndsey and V.F.

[¶26.] The circuit court determined it was in V.F.'s best interest to allow Lyndsey to serve as her primary physical custodian. The court also accepted Lyndsey's proposal to allow Jeremy to have more parenting time than would have been allowed by the South Dakota Parenting Guidelines, including virtually the

---

4. Jeremy was 33 years old at the time of the trial, and Lyndsey was 32.

entire summer, most of the spring break, and additional time over Christmas and Thanksgiving holidays.

[¶27.] Jeremy has appealed, claiming the circuit court abused its discretion by awarding primary physical custody of V.F. to Lyndsey.

## Analysis and Decision

[¶28.] When circuit courts make custody determinations, they are "guided by consideration of what appears to be for the best interests of the child in respect to the child's temporal and mental and moral welfare." SDCL 25-4-45. We have described this essential standard as the "brightest beacon" in child custody determinations. *Zepeda v. Zepeda*, 2001 S.D. 101, ¶ 13, 632 N.W.2d 48, 53. "Child custody determinations are reviewed for an abuse of discretion." *Evens v. Evens*, 2020 S.D. 62, ¶ 21, 951 N.W.2d 268, 276 (citing *Shelstad v. Shelstad*, 2019 S.D. 24, ¶ 20, 927 N.W.2d 129, 134). "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *Id.*, 951 N.W.2d at 277 (citations omitted).

[¶29.] In order to assist in its determination of a child's best interests, circuit courts often utilize the factors set out in *Fuerstenberg*, 1999 S.D. 35, ¶¶ 24–33, 591 N.W.2d 798, 807–10. These include parental fitness, stability, primary caretaker, child's preference, harmful parental misconduct, separating siblings, and substantial change of circumstances. *Id.*

[¶30.] Though the *Fuerstenberg* factors have become an accepted means of determining child custody disputes, a court is not, strictly speaking, *required* to

examine them in its best interests determination. *See McCarty v. McCarty*, 2015 S.D. 59, ¶ 12, 867 N.W.2d 355, 359 ("The [circuit] court may, but is not required to, consider the . . . *Fuerstenberg* factors in determining the best interests and welfare of the [children] . . . .") (first and third alterations in original). This is because questions concerning the best interests of children involve unique, fact-intensive considerations and are much more nuanced than simply determining which parent fares better under a larger number of the *Fuerstenberg* factors.

[¶31.] However, we have counseled circuit courts to use a "balanced and systematic approach" in the determination of a child's best interests. *See Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 18, 826 N.W.2d 627, 634 (describing the need for a systematic and balanced approach to a court's custody analysis). For this reason, the eminently practical *Fuerstenberg* factors are best viewed as a means for a court to achieve form and structure in its analysis, particularly where the court issues oral findings and conclusions from the bench.

[¶32.] Here, the circuit court was properly oriented to V.F.'s best interests and utilized a number of applicable *Fuerstenberg* factors, including parental fitness,[5] stability, primary caretaker, the existence of harmful misconduct, and the

---

5. The circuit court's consideration of parental fitness also extended further into several constituent considerations such as: "(1) mental and physical health; (2) capacity and disposition to provide the [children] with protection, food, clothing, medical care, and other basic needs; (3) ability to give the [children] love, affection, guidance, education and to impart the family's religion or creed; (4) willingness to maturely encourage and provide frequent and meaningful contact between the [children] and the other parent; (5) commitment to prepare the [children] for responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and (6) exemplary modeling so that the [children] witness[ ] firsthand what it means to be a
(continued . . .)

possibility of separating V.F. from her half-brother, A.M. Among these factors, Jeremy trains his arguments upon the court's consideration of stability. In Jeremy's view, "Lyndsey has done nothing to create stability for V.F. from the day she separated from Jeremy in October of 2017." A principal component of this contention is Jeremy's claim that the court abused its discretion by giving "scant, incomplete, and clearly erroneous" consideration to the stability factor. These assertions, however, are not sustainable.

[¶33.] To begin, Jeremy's reference to "scant" and "incomplete" consideration can be sourced to our discussion of the abuse of discretion standard of review in *Pietrzak v. Schroeder*, 2009 S.D. 1, 759 N.W.2d 734. There, we stated that "[a]n abuse of discretion occurs in a child custody proceeding when the trial court's review of the traditional factors bearing on the best interests of the child is scant or incomplete." *Id.* ¶ 37, 759 N.W.2d at 743. This is not to say, however, that a circuit court must consider each of the *Fuerstenberg* factors in order to correctly determine a child's best interests. As indicated above, our cases generally hold that the opposite is true—"a court is not bound to make a specific finding in each [*Fuerstenberg*] category; indeed, certain elements may have no application in some

---

(. . . continued)
good parent, a loving spouse, and a responsible citizen." *Schieffer*, 2013 S.D. 11, ¶ 17, 826 N.W.2d at 634 (quoting *Kreps v. Kreps*, 2010 S.D. 12, ¶ 26, 778 N.W.2d 835, 843–44).

cases, and for other cases there may be additional relevant considerations."

*McCarty*, 2015 S.D. 59, ¶ 12, 867 N.W.2d at 359.[6]

[¶34.] But more to the point, Jeremy's claim that the circuit court overlooked any serious consideration of stability is not supported by the record. The court expressly considered the traditional factor of stability and Jeremy's specific argument about it—the court simply reached a different conclusion than Jeremy would have preferred.

[¶35.] The circuit court was keenly aware of the fact that after the parties' separation, Lyndsey changed addresses multiple times. But this appears to be directly related to the parties' separation. Jeremy remained in the marital home, and Lyndsey moved elsewhere.

[¶36.] In addition, Lyndsey had not worked outside of the home since V.F. was born and was faced with the challenge of beginning a new way of life that allowed her to independently provide not only for herself, but also for V.F. She did so by beginning a career in law enforcement, which ultimately led her to her present position as a Customs and Border Protection officer. This career choice entailed an extended period of initial training and, unfortunately, absence from V.F. But the circuit court's determination that this was fleeting and not a sign of enduring instability was reasonable.

---

6. The genesis of this quoted language extends back through several opinions. *See Roth v. Haag*, 2013 S.D. 48, ¶ 13, 834 N.W.2d 337, 340; *Beaulieu v. Birdsbill*, 2012 S.D. 45, ¶ 10, 815 N.W.2d 569, 572; *Zepeda*, 2001 S.D. 101, ¶ 13, 632 N.W.2d at 53.

[¶37.] In her current position, Lyndsey earns a good living and has a home of her own in the Fairfield area. She lives near her family and is able to co-parent with A.M.'s father who also lives nearby. Lyndsey testified that her fellow officers and supervisors are supportive of her parenting responsibilities. In a relatively short period of time, Lyndsey has transitioned from a stay-at-home-mother to a federal law enforcement officer. Under the circumstances, we agree with the circuit court's finding that "[t]he time that Lyndsey spent in Georgia was a short-term absence for a long-term gain, and I'm not going to hold it against Lyndsey for bettering her future and, in turn, [V.F.'s] future."

[¶38.] This is not to say that Jeremy did not meet his obligations as V.F.'s father. He most assuredly did. But his claim that he, alone, represented stability for V.F. exposes a recency bias that the circuit court noted. For much of V.F.'s life leading up the parties' separation, Lyndsey stayed at home and provided stability and constancy for V.F., oftentimes in the midst of Jeremy's long hours of work. After the separation, the court noted, the primary caretaker roles reversed for a short time while Lyndsey established her own career and home. In the circuit court's words, the primary caretaker role "ebbed and flowed based upon the circumstances at the time, but it's really equal between the parties."

[¶39.] Under the circumstances, we do not believe the circuit court overlooked or gave "scant" or "incomplete" consideration to the concept of stability in connection with V.F.'s best interests. Further, the deciding, or "tipping," factor for the court was its finding that Jeremy did not encourage meaningful communications with

Lyndsey. The court found, in this regard, that Jeremy was "more demanding and less flexible" than Lyndsey—a determination Jeremy has not challenged on appeal.

[¶40.]    In what the custody evaluator and the circuit court both agreed was a "close case," the deferential standard of review we must apply is outcome determinative. Jeremy appears, from the record, to be an excellent father, and on our cold record, we can envision the possibility that he might have prevailed. However, our role as a reviewing court forbids us from considering the evidence anew and acknowledges a trial court's preeminent role in weighing the evidence. *See Baun v. Estate of Kramlich*, 2003 S.D. 89, ¶ 21, 667 N.W.2d 672, 677 ("The credibility of the witnesses, the import to be accorded their testimony, and the weight of the evidence must be determined by the trial court, and we give due regard to the trial court's opportunity to observe the witnesses and examine the evidence."). Therefore, we conclude that the court's decision to grant primary physical custody of V.F. to Lyndsey was not an abuse of discretion.

[¶41.]    Finally, both parties have also requested appellate attorney fees, which are authorized by SDCL 15-17-38 in child custody cases under "appropriate" circumstances, "in the interests of justice[.]" Considering the close balance of the evidence and the course of the litigation reflected in the record, we see nothing to justify an award of appellate attorney fees to either party in this case.

[¶42.]    We affirm.

[¶43.]    JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.