#30808-a-MES
**2025 S.D. 71**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

BRIAN RAY JESSOP,                                    Plaintiff and Appellee,

    v.

LISA JO COMBS,                                         Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOSHUA HENDRICKSON
Judge

\* \* \* \*

EMILY C. MAURICE
ROBERT D. TRZYNKA of
Halbach Szwarc Law Firm
Sioux Falls, South Dakota                          Attorneys for defendant and
                                                   appellant.


GEORGE J. NELSON
Rapid City, South Dakota                           Attorney for plaintiff and
                                                   appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
AUGUST 26, 2025
OPINION FILED **12/17/25**

#30808

SALTER, Justice

[¶1.]        Brian Jessop and Lisa Combs have one child together, B.J.J.  Brian

petitioned the circuit court seeking parenting time in accordance with the South

Dakota Parenting Guidelines.  Lisa resisted and sought sole legal and physical

custody of B.J.J. and an order that would permit only supervised visitation for

Brian.  The court awarded both parents legal custody.  Lisa received primary,

physical custody and Brian parenting time in accordance with the Parenting

Guidelines.  Lisa appeals, identifying several issues relating to the court trial and

the court's decision to grant Brian's request for unsupervised visitation.  We affirm.

### Factual and Procedural History

[¶2.]        Brian and Lisa met online in January 2019.  Their relationship

progressed quickly, and Lisa moved from Rapid City into Brian's home in Pleasant

Grove, Utah in June 2019.  Shortly thereafter, Lisa became pregnant with B.J.J.,

who was born in March 2020.  In January 2021, Brian and Lisa's relationship

deteriorated in the months that followed, and Lisa and B.J.J. moved to Rapid City.

[¶3.]        Brian commenced this action in August 2021, seeking sole legal and

physical custody of B.J.J.  As he explained at trial, however, the essence of his

request was parenting time consistent with the Parenting Guidelines.  Prior to the

litigation and during its pendency, Lisa would not allow Brian to have unsupervised

or overnight visits with B.J.J.  Lisa's opposition to Brian's request for unsupervised

parenting time rests almost entirely upon her assertion that Brian and his family

members are or were associated with the Fundamentalist Church of Latter-Day

Saints (FLDS).

-1-

[¶4.]     The parties engaged a custody evaluator whose report recommended that Lisa be the primary custodial parent. The evaluation also recommended that Brian "should be allowed a visitation schedule consistent with [the] South Dakota Guidelines. Whether this should include overnight or unsupervised visitation is a matter for the [c]ourt to decide[.]"

[¶5.]     The circuit court conducted a two-day bench trial that began on June 4, 2024, a Tuesday. The Friday before the trial, Lisa filed a motion to continue, claiming a "key witness" identified as Sam Brower was unable to testify due to "a severe heart condition which [] prevent[ed] him from traveling to South Dakota." In a supporting affidavit, Lisa asked the court to permit remote testimony and stated Brower's "diagnosis and inability to travel was confirmed by a medical professional on May 30, 2024."

[¶6.]     At the beginning of trial, Lisa again asked for a continuance, reiterating her rationale and adding that Brower had recently been admitted to the emergency room for his heart condition. Lisa asserted that Brower's testimony was "crucial to the defense's case" and sought "either the continuance or the ability to take that trial deposition with leave of [c]ourt." When the circuit court asked about the nature of Brower's testimony, Lisa's counsel responded generally by explaining that Brower's testimony would focus on the safety concerns related to allowing Brian unsupervised parenting time with B.J.J. Lisa did not, however, include a proffer of Brower's specific testimony or a report or affidavit from Brower. The court denied the motion to continue citing the length of time the hearing had been scheduled and difficulty in determining a remote witness's credibility.

[¶7.]     The testimony from Brian and Lisa at trial revealed a short-term romantic relationship during which they lived together in Utah. Brian testified that Lisa did not work while living in Utah, but after B.J.J.'s birth, she cared for the child. Brian worked in construction and testified that, while not at work, he was involved in B.J.J.'s care.

[¶8.]     Over time, Brian explained the relationship became "quite combative." According to Brian, Lisa informed him she was leaving and moved to Rapid City with B.J.J. Lisa, on the other hand, contends that Brian told her to leave. But regardless, after Lisa and B.J.J. moved out in January 2021, Brian did not have unsupervised or overnight visits with B.J.J. up to the time of the June 2024 trial.

[¶9.]     Brian testified that, initially, he would often call Lisa so he could see B.J.J. using FaceTime, but that became less frequent over time. He stated that Lisa eventually blocked his phone number in April 2021, and he was unable to contact B.J.J. through FaceTime until roughly a year later, in March 2022, after obtaining assistance from his attorney.

[¶10.]     For the next two years, during the pendency of this action, Brian testified he had only a few in-person visits with B.J.J. All of them were in Rapid City and all were supervised by Lisa or her parents. During his testimony, Brian described his requests for unsupervised visits and what he asserted to be Lisa's refusal and lack of cooperation in scheduling any type of visit with B.J.J.

[¶11.]     Lisa testified that early in their relationship she knew Brian had been raised by FLDS parents and that his father practiced polygamy, but initially she did not understand specific FLDS practices or beliefs. However, after she moved in

with Brian and in the time since leaving Utah, Lisa testified that she has learned much more about the FLDS, which she claims has a history of child abuse and abducting children from their non-FLDS parents.

[¶12.] In order to attribute the broader FLDS series of allegations to this case, Lisa sought to present Brian as a practicing FLDS member. But the evidence submitted to the circuit court on this point was highly disputed.

[¶13.] Brian testified that he disclaimed practicing FLDS teachings as a teen, and, though he recalled sending a letter when he was around 17 to former FLDS leader Warren Jeffs, he could not recall the letter's purpose or content.[1] Brian also stated that he had not been to an FLDS service in many years. He did acknowledge that he was raised in an FLDS home and has many half siblings as a result of his father engaging in plural marriages. But he explained that he does not live in an FLDS community or practice the FLDS faith.

[¶14.] Instead, Brian lives and works in what he describes in his brief as a "mainstream environment[.]" He explained that he does not abide by the FLDS dress code for men, except perhaps when he is visiting his parents, and has grown facial hair which is strictly forbidden by the FLDS, as is having a child out of wedlock. Brian confirmed he has no intention of engaging in the FLDS religion or its practices, though he did not directly condemn the FLDS religion.

[¶15.] Lisa points to several examples to support her claim that Brian does, in fact, follow FLDS teachings. She testified that Brian refused to disavow

---

1. Warren Jeffs is currently serving a life sentence after he was convicted in Texas of sexually abusing two young girls.

polygamy and underage marriage and kept a photo of Warren Jeffs in their home. Lisa also said that Brian had her listen to recordings by FLDS leaders when they lived together.

[¶16.] Brian responded that he displayed the photo because Jeffs "was a respected leader of the community in which [he] was raised." Brian confirmed that he and Lisa listened to recordings of Brian's father teaching "Sunday School" during their relationship, but these were not FLDS services. Brian considered these to be more like family events, but he agreed that "Sunday schools may have been FLDS in nature to the extent that those did reflect some of the beliefs of [his] family members[.]"

[¶17.] Seemingly unrelated to her claims that Brian remains an FLDS member, Lisa also alleged that Brian raped her on July 1, 2019, which she asserted resulted in B.J.J.'s conception. This was offered in connection with a separate statutory argument that visitation with Brian would not be in B.J.J.'s best interests. *See* SDCL 25-4A-20 (providing for a "rebuttable presumption that it is not in the best interest of the child for the court . . . to grant visitation rights to a person that the court has found . . . to have committed an act of rape . . . against the other parent that resulted in the conception of the child"). According to Lisa, the incident began at their apartment when Brian offered her a pill for her anxiety. She recalled becoming sleepy, Brian pulling down her pants, and moving toward the couch. When she woke up, Lisa said Brian asked her if she remembered them having sex the previous night.

[¶18.]     Lisa testified she was familiar with her ovulation cycles and was not having sex with Brian during that time to avoid conception. She said she did not report the rape because she "just disassociated" from it and was "[a]fraid of backlash[.]" Brian denied the rape allegations and the accusation that he drugged Lisa. He testified that during the timeframe of the allegations, the two lived together and frequently engaged in consensual sexual relations.

[¶19.]     Lisa also testified that she "was not allowed to work . . . wasn't even allowed to have gas in [her] car . . . [and] had to tell [Brian] everywhere [she] went." She stated that Brian had a temper and threatened to kill her many times. Lisa alleged that after B.J.J. was born, Brian "would hold [B.J.J.] and then tell [Lisa] that he's going to go do something to her, rape her, molest her, and then go take her into the other room." Brian denied that he ever threatened to kill Lisa or molest B.J.J.

[¶20.]     Lisa's father, Kent Christopherson, testified that "Brian puts on a very nice persona as a nice young man." Kent related that he tried to mentor Brian and "realized [Brian] grew up in a completely different cultural paradigm . . . the FLDS is about control and obedience, and with him growing up in that world he expected the same thing of Lisa." Kent stated that he helped Brian and Lisa financially with cash assistance close to $17,000 over the course of their relationship. Kent testified that he had independent financial wealth and that he was financing Lisa's litigation and ongoing support for her and B.J.J. He reiterated Lisa's rape and threatened molestation allegations but acknowledged he had no personal knowledge of the

allegations and learned of them through Lisa. According to Kent, the purpose of the litigation is to protect B.J.J. from being abducted.

[¶21.] On the second day of trial, Lisa renewed her request for additional time to take Brower's trial deposition. But, again, her counsel referenced Brower's proposed testimony only in unspecific terms, such as, "there are allegations that a lot of evidence has not been able to come in to support certain things." The circuit court asked Lisa's counsel, "do you believe his testimony would be . . . specific in relation to Brian Jessop individually or more in line with just FLDS principles and beliefs in general?" Lisa's lawyer simply stated, "Both." Brian opposed the request and added that Lisa "hasn't provided any information as to what Mr. Brower has. And if there was an investigative report done, we're entitled to that . . . . He wasn't even identified timely pursuant to Rule 26 on discovery." The court again denied the motion to continue.

[¶22.] Lisa did present FLDS-related testimony from Utah attorney Roger Hoole, who testified that he has represented former FLDS members. Hoole stated that "women and children are viewed as belonging to the leadership, not the parents. They're treated . . . as property." As part of his work, Hoole explained that he had helped former FLDS "parents recover their children" remaining in FLDS care. As it related to this case, however, Hoole acknowledged that he had never met Brian or observed him with B.J.J. and that he had no evidence that Brian is, in fact, an FLDS member.

[¶23.] In the years since his relationship with Lisa ended, Brian met and married his wife, Amber, who testified at trial as a rebuttal witness. When she was

asked whether she understood that the circuit court had issued a witness sequestration order at the beginning of trial, Amber said she was not told of the order until the morning of her scheduled testimony.[2]  Lisa's counsel asked whether Amber had discussed "this case or any testimony that occurred yesterday with" Brian, to which Amber responded, "yes."  Lisa then asked the court to exclude Amber's testimony in light of the sequestration order.  Brian objected and asserted that Amber was a rebuttal witness and should not be subject to the sequestration order.  The court denied Lisa's request to exclude the rebuttal testimony.

[¶24.]     Amber testified that she and Brian married in October 2023 and have one child together.  She stated she was raised in the Church of the Latter-Day Saints (LDS) faith, but she "stopped attending church a few years ago."  Amber also testified that she works full-time outside of the home and that Brian has never forced the FLDS religion on her or actively practiced it.

[¶25.]     The circuit court took the matter under advisement but soon entered written findings of facts and conclusions of law.  The court rejected Lisa's claim that Brian had raped her, stating it did "not find Lisa's testimony regarding the conception of BJJ to be credible given the totality of the circumstances."  This determination neutralized Lisa's claim that visitation between Brian and B.J.J. was presumptively not in the child's best interests under SDCL 25-4A-20.

[¶26.]     Beyond this, the circuit court identified the principal factual dispute as the extent of Brian's involvement with the FLDS, if any.  The court recognized that

---

2.     It is unclear whether or how much time during the first day that Amber was in the courtroom.  The record indicates she and Brian were taking turns caring for their young child outside of the courtroom.

the FLDS "has [a] history of treating women and children as property[,]" "arranging marriage between underage girls with sometimes much older men[,]" and has a "history of missing children and the potential abduction of children from the non-FLDS parents[.]"

[¶27.] Ultimately, however, the circuit court found that Brian was not "a current member or follower of the FLDS faith." The court found "Brians current and past relationships, including his relationship with Lisa, having a child out of wedlock with a non-FLDS member seems to this [c]ourt, contrary to the belief that he is a practicing member of the FLDS." The court concluded the evidence was not "sufficient to establish that Brian does, or would follow FLDS edict."

[¶28.] The circuit court considered the best interest factors drawn from our decision in *Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, 591 N.W.2d 798, and concluded "it is in the best interests of the child that the parties share legal custody of the child, with Lisa having primary physical custody." Most relevant to this appeal, the court determined that "Brian shall have parenting time in accordance with the South Dakota Parenting Guidelines," but because of B.J.J.'s age, the court established a transition plan for the relatively short time before B.J.J. reached five years of age, including "continue[d] video contact" along with "in person visitation by Brian . . . in Rapid City" which the court ordered "should be allowed as unsupervised[.]" The court also considered and rejected each parties' request for attorney fees under SDCL 15-17-38.

[¶29.] Lisa appeals, raising four issues which we restate as follows:

> 1. Whether the circuit court abused its discretion when it denied Lisa's motion to continue due to Brower's absence.

2.      Whether the circuit court abused its discretion when it denied her request to exclude Amber's rebuttal testimony based upon a violation of the court's witness sequestration order.

3.      Whether the circuit court clearly erred when it found that Brian was not an FLDS member or follower and further found that Brian had not raped Lisa, making the court's decision to grant Brian unsupervised visitation an abuse of discretion.

4.      Whether the circuit court abused its discretion when it denied Lisa's request for attorney fees.

**Analysis**

*Motion to continue*

[¶30.]      "A trial court's decision to grant or deny a continuance is reviewed under an abuse of discretion standard." *VOR, Inc. v. Est. of O'Farrell*, 2025 S.D. 2, ¶ 35, 17 N.W.3d 252, 261 (quoting *People ex rel. L.N.*, 2022 S.D. 8, ¶ 41, 970 N.W.2d 531, 544). "The granting or refusing [of] a continuance rests in the sound discretion of the court below, and its ruling will not be reversed, except for the most cogent reasons." *Id.* (alteration in original) (quoting *L.N.*, 2022 S.D. 8, ¶ 41, 970 N.W.2d at 544).

[¶31.]      "When a continuance is sought to obtain the testimony of an unavailable witness, three requirements must be established: (1) the testimony must be material; (2) the party seeking the continuance must have used due diligence to secure the witness's attendance or deposition; and (3) 'it must be reasonably certain the presence of the witness or [the] testimony will be procured by the time to which the trial would be postponed.'" *State v. Jackson*, 2020 S.D. 53, ¶ 53, 949 N.W.2d 395, 411 (quoting *State v. Karlen*, 1999 S.D. 12, ¶ 24, 589 N.W.2d

594, 600). Where a trial court refuses to grant a continuance, we may also examine the impact of the decision in the context of prejudice to the moving party. *See Tosh v. Schwab*, 2007 S.D. 132, ¶ 25, 743 N.W.2d 422, 430 (quoting *State v. Moeller*, 2000 S.D. 122, ¶ 8, 616 N.W.2d 424, 431) (listing additional factors for a circuit court's consideration when deciding a motion to continue).

[¶32.]		The circuit court did not abuse its discretion when it denied Lisa's request for a continuance only days before the trial. Simply put, Lisa's request for a continuance lacks a sufficient showing of materiality—that is, a showing of what specifically Brower's testimony would provide relative to the current custody and parenting time dispute.

[¶33.]		Instead, Lisa's request contained only conclusory statements about Brower's overall importance. Scattered throughout the record are isolated references to Brower's work as a private investigator who has knowledge of the FLDS organizational structure and the conduct of some of its members, apparently including knowledge of Brian's father. However, what exactly Brower would have said at trial is unknown. Lisa's father, Kent, described Brower as an "expert" witness, but there was no indication that Brower either had been disclosed as an expert or, more importantly, prepared an expert report from which the court could assess the significance of his testimony.

[¶34.]		And if, as seems the case, Brower was going to describe the FLDS in unfavorable terms, Lisa was not deprived of that type of evidence. Utah attorney Roger Hoole provided testimony that was highly critical of the FLDS based upon his experiences litigating cases against the FLDS or its members. In her own

testimony, Lisa stated that Brian's father, through his business, had been fined for child labor violations. None of this evidence appeared to be controverted, and, for its part, the circuit court appears to have accepted most of this evidence because it made several findings describing the FLDS in harsh terms.

[¶35.] Lisa also testified at length about her understanding of the FLDS and Brian's conduct. Regarding the child abduction concerns, Lisa testified to Warren Jeffs's orders from prison for FLDS men to "gather the children from their apostate mothers[.]"

[¶36.] Under the circumstances, Lisa did not make a showing that Brower's testimony was material to the case or that the absence of his testimony prejudiced her. In our view, the circuit court's decision to deny the continuance was within the range of permissible choices. *Jackson*, 2020 S.D. 53, ¶ 53, 949 N.W.2d at 411.

**Sequestration order**

[¶37.] "The decision to . . . exclude testimony when the court's sequestration order is violated is within the sound discretion of the circuit court." *State v. Randle*, 2018 S.D. 61, ¶ 21, 916 N.W.2d 461, 466 (citations omitted). A party may obtain relief on appeal "where a sequestration order was violated" and the violation "prejudiced the defendant's rights." *Id.* (quoting *State v. Dixon*, 419 N.W.2d 699, 701 (S.D. 1988)). "Prejudice is established where the witness'[s] testimony has changed or been influenced by what [they] heard from other witnesses." *Id.* (alterations in original) (quoting *State v. Swillie*, 357 N.W.2d 212, 215 (Neb. 1984)).

[¶38.] Because Amber testified as a rebuttal witness, Brian argues that there was no violation of the circuit court's sequestration order. The court's order was an

oral, generic command for sequestration of "witnesses testifying." Consequently, we are not entirely certain if Amber's rebuttal testimony was included in the scope of the court's order, but, even if it was, Lisa has not shown prejudice from Amber's testimony.

[¶39.]     Lisa argues "Amber's testimony was used to conclude that Brian was not involved with FLDS and to bolster his credibility." But the nature of rebuttal testimony very often emphasizes evidence presented earlier in the case, and we are unable to understand how the recency of Amber's testimony creates prejudice. And, beyond this, Lisa does not show how Amber's testimony changed or was influenced by Brian. *Randle*, 2018 S.D. 61, ¶ 21, 916 N.W.2d at 466; *accord Ctr. of Life Church v. Nelson*, 2018 S.D. 42, ¶ 33, 913 N.W.2d 105, 114 (affirming denial of a new trial motion for a violation of a sequestration order in the absence of a showing that the violating witness's testimony was impacted).

***Unsupervised parenting time***

[¶40.]     "In deciding the best interests of a child in a custody dispute, the court must consider the child's temporal, mental and moral welfare." *Fuerstenberg*, 1999 S.D. 35, ¶ 22, 591 N.W.2d at 806 (citations omitted). "There are no formulas for making child custody decisions." *Id.* (citations omitted). "It is not for this Court, but for the trial court, to gauge the credibility of the witnesses and to weigh the significance of their testimony." *Id.* (citations omitted). "Trial courts possess broad discretion in deciding the best interests of a child; their decisions will only be disturbed upon a finding of abuse of discretion." *Id.* (citations omitted). We review findings of facts related to the court's best interest determination under our clearly

erroneous standard, which means "[t]his Court must be left with a definite and firm conviction that a mistake has been made to overturn a circuit court's findings." *Dunham v. Sabers*, 2022 S.D. 65, ¶ 27, 981 N.W.2d 620, 633 (citation omitted).

[¶41.] We have recognized that the seven factors gleaned from *Fuerstenberg*—"parental fitness, stability, primary caretaker, child's preference, harmful parental misconduct, separating siblings, and substantial change of circumstances—'have become an accepted means of determining child custody disputes, [though] a court is not, strictly speaking, required to examine them in its best interests determination.'" *Harwood v. Chamley*, 2023 S.D. 35, ¶ 19, 993 N.W.2d 594, 599 (quoting *Flint v. Flint*, 2022 S.D. 27, ¶ 30, 974 N.W.2d 698, 703). But "[r]equired or not, the *Fuerstenberg* factors are an 'eminently practical . . . means for a court to achieve form and structure in its analysis.'" *Id.* (second alteration in original) (quoting *Flint*, 2022 S.D. 27, ¶ 31, 974 N.W.2d at 703).

[¶42.] Lisa's argument that the circuit court abused its discretion by granting Brian unsupervised visitation is a narrow one in the sense it is premised upon two discrete factual findings she believes to be clearly erroneous. Lisa alleges first that Brian is effectively an FLDS member whose religious practices pose "serious threats" to B.J.J. In addition, Lisa asserts that B.J.J. was conceived as a result of Brian raping her, making his request for visitation contrary to B.J.J.'s best interests. We address each factual challenge in turn.

a. *FLDS and Brian's involvement*

[¶43.] The circuit court made the following findings of fact relating to Lisa's sustained FLDS argument and her effort to suggest that Brian is an FLDS member:

50. One of the biggest areas of contention in this matter deals with Brians involvement with the [FLDS].

51. Dr. Moss [the custody evaluator] includes a brief synopsis in his report on the background of the FLDS that the [c]ourt considers accurate.

52. Further testimony was presented by the defendant through [Roger] Hoole, a Utah attorney that has experience dealing with the FLDS in relation to custody cases.

53. This [c]ourt does recognize that the FLDS has history of treating women and children as property.

54. The FLDS further has a history of child abuse in arranging marriage between underage girls with sometimes much older men.

55. The head of the FLDS church at one point, Warren Jeffs, is currently serving a federal prison sentence in relation to activities involving underage girls.

56. Most concerning to the [c]ourt is the history of missing children and the potential abduction of children from the non-FLDS parents as described by defense witnesses.

57. Brian does have connections to the FLDS.

58. Brians father appears to be a current member and is also engaged in the practice of plural marriage appearing to have five (5) wives.

59. Brian was raised in the FLDS, but indicates he is no longer a practicing member.

60. Brian still has contact with family that are practicing FLDS members, most notably his parents.

67. Brian indicates he moved away from FLDS as a teenager.

68. Brian indicates he intends to have a discussion about the FLDS with [B.J.J.] once more age appropriate.

[¶44.] The circuit court ultimately found that Brian was not a current member or follower of the FLDS and that the evidence was insufficient "to establish

that Brian does, or would follow FLDS edict. Particularly in regard to the issues of concern regarding the safety of [B.J.J.]." These factual findings are supported by the evidentiary record and are not clearly erroneous.

[¶45.]    In weighing the evidence presented, the circuit court acknowledged the potential dangers of the FLDS generally and specifically noted testimony about unspecific allegations of child abuse and abductions. But the result in this case and our appellate review of this fact-bound record are not a referendum concerning the FLDS's beliefs or practices or the alleged conduct of individual members. Here, the court logically concluded that it was not enough to simply say that Brian was at one time associated with the FLDS church because he was born to FLDS-member parents and should not, therefore, be able to exercise unsupervised parenting time with B.J.J.

[¶46.]    Instead, the circuit court applied the correct legal principles relating to custody cases and appropriately found that more evidence was necessary, beyond Lisa's general indictment of the FLDS, to support her factual assertion that Brian's involvement was continuing and jeopardized B.J.J.'s best interests. The court determined, in this regard, that specific and credible evidence relating to Brian was conspicuously missing from Lisa's more general evidence concerning the FLDS, which appears to have been otherwise largely undisputed.

[¶47.]    Lisa and Hoole's testimony about stories of missing children associated with the FLDS were not specific to Brian or his family; they were general allegations about the FLDS. Hoole admitted he lacked "independent knowledge" regarding any ties Brian may have to the FLDS. And while the evidence supported

a finding that Brian's father practices polygamy, Brian testified that he does not, nor does he desire to have more than one wife. Although Brian dresses more traditionally when he visits his parents, his lifestyle conflicts with the FLDS beliefs and practices in other ways.

[¶48.] For instance, since he stopped practicing as an FLDS member in his teenage years, he has grown facial hair and fathered a child out of wedlock.[3] He also foregoes tithing. According to the evidence at trial, these are all contrary to the FLDS tenets he walked away from a decade ago. Ultimately, the court reasoned that the evidence presented did not tie Brian to the allegations relating to the FLDS.

[¶49.] The circuit court was not merely in the best position to weigh this evidence; we are prohibited from separately reweighing this evidence or assessing credibility by virtue of our role as a reviewing court.[4] And because the court's findings are supported by the evidence, we cannot discern any clear error.[5]

---

3. Brian's testimony is supported by Lisa's on this issue. During her testimony, she said, "it's pretty much unheard of for a gentile to get pregnant by a member of the FLDS." Lisa further stated that when she told this information to Brower, he found it "a little off" and she had to further explain her "unique story[.]"

4. Lisa submitted a supplemental brief pursuant to SDCL 15-26A-73 on July 28, 2025, in which she argued that Brian's post-appeal effort before the circuit court to seek an order restraining Lisa from disparaging the FLDS in communications related to parenting time or B.J.J.'s welfare demonstrates implicit sympathy or allegiance to the FLDS. A supplemental brief submitted under SDCL 15-26A-73 is limited to briefing on "late authorities, newly enacted legislation, or other intervening matters," and we do not believe the information provided by Lisa is any of these things. It appears, instead, to be an unauthorized effort to augment the trial record with factual information that was not before the circuit court. *See* SDCL 15-26A-47

(continued . . .)

b. *The rape allegation*

[¶50.] The text of SDCL 25-4A-20 provides for a "rebuttable presumption that it is not in the best interest of the child for the court . . . to grant visitation rights to a person that the court has found . . . to have committed an act of rape . . . against the other parent that resulted in the conception of the child." Here, however, the factual premise underlying the statutory presumption is not satisfied.

[¶51.] The circuit court found "Lisa's testimony regarding the conception of [B.J.J.]" was not "credible given the totality of the circumstances." Lisa never reported the alleged rape or sought medical attention. Lisa testified that she had sex with Brian both before and after the alleged rape. Brian testified the rape Lisa alleged at trial would have occurred shortly after she moved in with him at a time when, he stated, they "were frequently engaging in sexual relations."

[¶52.] Because the circuit court did not find Lisa credible, which, again, is within its role as a fact finder and not clearly erroneous, SDCL 25-4A-20 does not apply. *Fuerstenberg*, 1999 S.D. 35, ¶ 22, 591 N.W.2d at 807 (citations omitted) ("gaug[ing] the credibility of the witnesses and [] weigh[ing] the significance of their testimony" is for the circuit court).

---

(. . . continued)

(defining the record on appeal as the "original pleadings, papers, offered exhibits, and transcripts of the proceedings").

5.  Lisa also claims the circuit court should have applied the Uniform Child Abduction Prevention Act (UCAPA), which allows the court to "order abduction prevention measures in a child-custody proceeding if the court finds that the evidence establishes a credible risk of abduction of the child." SDCL 26-18-4(a). But because the circuit court did not find a credible risk of abduction based on the evidence, it properly declined to apply the UCAPA.

[¶53.] Having determined Lisa's two factual arguments are not clearly erroneous, we conclude that the circuit court's decision to permit unsupervised visitation between Brian and B.J.J. is otherwise within the court's discretion and the range of permissible choices. The court considered the panoply of applicable *Fuerstenberg* factors and concluded it was in B.J.J.'s best interest for her father to exercise unsupervised parenting time with her. We see no abuse of discretion in its analysis.

### Attorney fees

[¶54.] Attorney fee awards are reviewed for an abuse of discretion. *Evens v. Evens*, 2020 S.D. 62, ¶ 21, 951 N.W.2d 268, 276 (quoting *Green v. Green*, 2019 S.D. 5, ¶ 11, 922 N.W.2d 283, 288). The award of attorney fees in a custody action is guided by a two-step analysis:

> First, the court must determine what constitutes a reasonable attorney's fee. This requires consideration of: (1) the amount and value of the property involved; (2) the intricacy and importance of the litigation; (3) the labor and time involved; (4) the skill required to draw the pleadings and try the case; (5) the discovery utilized; (6) whether there were complicated legal problems; (7) the time required for the trial; and (8) whether briefs were required. Second, it must determine the necessity for such fee. That is, what portion of that fee, if any, should be allowed as costs to be paid by the opposing party. This requires consideration of the parties' relative worth, income, liquidity, and whether either party unreasonably increased the time spent on the case.

*Id.* ¶ 44, 951 N.W.2d at 282 (quoting *Green*, 2019 S.D. 5, ¶ 13, 922 N.W.2d at 288); *see also* SDCL 15-17-38 ("The court, if appropriate, in the interests of justice, may award payment of attorneys' fees in all cases of . . . custody[.]"). "The trial court is

required to make specific findings based upon the factors." *Nickles v. Nickles*, 2015 S.D. 40, ¶ 35, 865 N.W.2d 142, 154 (citation omitted).

[¶55.]     Lisa argues the circuit court abused its discretion by not awarding attorney fees under SDCL 15-17-38 because Lisa's fees "were necessary and reasonable due to the complexity of the case, the legal issues involved, and Brian's general intransigence." Brian argues "the record supports the court's finding that neither party's conduct warranted a fee shift."

[¶56.]     Here, this custody dispute does not involve a novel issue, and the record contained information concerning the financial status of the parties. Brian earns a modest income, and Lisa is supported by her father. The circuit court's decision to not award attorney fees under SDCL 15-17-38 was within its discretion.[6]

### Appellate attorney fees

[¶57.]     Lisa requests $56,049.17 in appellate attorney fees. The motion was accompanied by an itemized and verified statement of the attorney fees pursuant to SDCL 15-26A-87.3. Brian does not request appellate attorney fees. Our rule at SDCL 15-26A-87.3 allows a party to move for appellate attorney fees "where such

---

6.     In a separate argument, Lisa challenges the circuit court's decision denying her request for attorney fees after its decision granting in part her motion to compel discovery shortly before trial. The court took the attorney fees issue under advisement and later denied it in a single line included in its custody decision. Citing the lack of findings, Lisa urges us to reverse the denial, but, despite the paucity of findings, the record will not permit complete and meaningful appellate review because it does not contain a transcript from the motion to compel hearing. In fact, when asked by her attorney at the custody trial, Lisa confirmed that she was "asking the [c]ourt to consider that hearing[.]" In instances like this where the appellate record "insofar as it exists" is "not adequate to the task, 'our presumption is that the circuit court acted properly.'" *Graff v. Child. Care Hosp. and Sch.*, 2020 S.D. 26, ¶ 16, 943 N.W.2d 484, 489 (citations omitted).

fees may be allowable[.]" Attorney fees in custody cases are allowable under SDCL 15-17-38. But we "examine the fee request from the perspective of whether the party's appellate arguments carried any merit." *Brosnan v. Brosnan*, 2013 S.D. 81, ¶ 42, 840 N.W.2d 240, 254 (citation omitted).

[¶58.] Here, Lisa has not prevailed on any of her appellate issues, and we are unable to see any other basis that would justify an award of attorney fees. Accordingly, we decline to grant appellant attorney fees.

## Conclusion

[¶59.] All of the issues Lisa identified are subject to a deferential standard of review, and, for the reasons expressed above, none can support her claims for reversal. We affirm.

[¶60.] JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, and KERN, Retired Justice, concur.

[¶61.] GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.